```
               UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF NEW HAMPSHIRE
```

<u>Tera Xtal Technology Corp.</u>

     v.                                Civil No. 16-cv-91-PB
                                         Opinion No. 2017 DNH 024
<u>GT Advanced Technologies, Inc., et al.</u>

### OPINION

    GT Advanced Technologies Limited ("GTAT") and affiliated entities are the debtors-in-possession (the "Debtors") in a jointly administered Chapter 11 proceeding before the United States Bankruptcy Court for the District of New Hampshire.  Tera Xtal Technology Corp. ("TXT"), a creditor in the case, filed an administrative expense claim that it argued was entitled to priority pursuant to § 503 of the Bankruptcy Code.  The Debtors challenged TXT's claim, a discovery schedule was established, and a deadline for the filing of dispositive motions was set.  After discovery closed, the Debtors filed a motion for summary judgment.  The bankruptcy court granted the motion and this appeal followed.

    When TXT was in bankruptcy court, it initially argued that its damages were caused by GTAT's postpetition breaches of certain prepetition obligations.  In responding to the Debtors'

summary judgment motion, TXT later also claimed that its damages were caused by GTAT's postpetition negligence. The bankruptcy court rejected both claims. On appeal, TXT challenges only the disposition of its postpetition negligence claim. The bankruptcy court determined that TXT lost its right to pursue the negligence claim because it failed to assert the claim until after discovery had concluded and the Debtors had filed their summary judgment motion. The court alternatively rejected the claim on its merits. I affirm the bankruptcy court's ruling.

## I.  BACKGROUND

### A.  Facts

TXT ordered a total of 98 advanced sapphire furnaces from GTAT through a series of purchase agreements in 2011. The furnaces are used to produce sapphire crystal in the form of cylinders called "boules." Portions of the boules can be of sufficient quality to be used in commercial applications. The furnaces themselves are controlled by computers, which in turn run software pre-installed by GTAT. The furnaces do not function without the software, and the software does not function without license codes provided by GTAT.

After GTAT delivered thirty furnaces through early 2012, TXT declined to buy the remaining furnaces because it claimed that the delivered furnaces did not meet contractually established

performance standards. In response, GTAT remotely deactivated the license codes for the delivered furnaces. Arbitration ensued. In August 2014, the arbitral tribunal rendered its award, finding that ten of the delivered furnaces did not conform to contract standards. Accordingly, TXT did not have to pay for the ten nonconforming furnaces or buy any of the furnaces that had not yet been delivered. Per the terms of the award, GTAT also had to "disassemble and remove the 10 non-compliant [furnaces] from TXT's facility" and "deliver software licenses to TXT with respect to the 20 [furnaces]" remaining with TXT. Doc. No. 24-4 at 407.

Later in August 2014, GTAT and TXT supplemented the arbitral award with a separate settlement agreement. In pertinent part, the agreement required GTAT to make two payments to TXT and "provide TXT with software licenses for the 20 [furnaces] that the Tribunal determined were accepted by TXT." Doc. No. 24-3 at 290-91. GTAT agreed to renew each software license annually and, "[i]n the event the software ceases to function, . . . provide whatever service is necessary to render the software operational." Id. at 291. To the extent the agreement and the arbitral award conflicted, the agreement controlled. Id. at 295.

GTAT made the first payment under the settlement agreement. It also delivered a USB drive on September 30, 2014, containing license codes for the twenty conforming furnaces. It did not,

3

however, make the second payment or remove the ten nonconforming furnaces from TXT's property.  Instead, GTAT and affiliated entities filed for Chapter 11 bankruptcy on October 6, 2014.

After GTAT filed for bankruptcy protection, TXT asked for GTAT's assistance in installing the license codes onto the twenty conforming furnaces.  On November 13, 2014, GTAT installed codes on two furnaces and TXT installed codes on the rest.  After the parties completed this process, TXT "tried to power on those 20 machines, but the [control boards] of . . . three machines [were] damaged."  Doc. No. 24-6 at 551 (deposition of TXT director Peggy Hsu).  TXT did not go any further in the furnace "initiation process" with respect to the other seventeen furnaces at that time because it feared damaging them.  Id.  In February 2015, though, TXT did "tr[y] to turn on one machine, but there was . . . no oil in the air pressure machine."  Id. at 555.

GTAT provided TXT with perpetual software licenses codes on August 3, 2015.

B.   **Proceedings Below**

On May 20, 2015, TXT filed a motion asking the bankruptcy court to approve an administrative expense claim for $3,789,963, the bulk of which was for lost profits.[1]  Doc. No. 24-2 at 5-6.

---

[1] The claim included storage costs stemming from GTAT's failure to remove the ten nonconforming furnaces.  That portion of the claim was ultimately resolved by a court-approved stipulation.

4

The motion drew on the language of the settlement agreement and explained that TXT's losses resulted from GTAT's "continuing failure to provide current and compatible software licenses for the 20 [furnaces] and provide the service necessary to render the software operational." See id. at 10.

The Debtors and the Official Committee of Unsecured Creditors objected to the claim in part on factual grounds. See id. at 146. Accordingly, the bankruptcy court issued a case management order establishing a discovery schedule and setting a deadline for the filing of dispositive motions. Id. at 146–47. After discovery closed, the Debtors challenged the claim in a motion for summary judgment. See id. at 255–56. In response, TXT again contended that its expenses were entitled to priority because they were caused by GTAT's postpetition breaches of its prepetition obligations. It also argued in the alternative that its expenses were the result of GTAT's postpetition negligence. See Doc. No. 24-4 at 377–81.

After holding a hearing, the bankruptcy court granted the Debtors' motion for summary judgment. Doc No. 24-9 at 781, 790. The court first determined that TXT's expenses were not entitled to priority to the extent that they were based on GTAT's postpetition breaches of its prepetition obligations. Id. at 791–94. It then disposed of TXT's negligence claims on alternative grounds. First, it determined that the negligence

5

claim advanced a new theory of liability that TXT could not raise for the first time in an objection to a motion for summary judgment.  Id. at 795-98.  It also concluded that the Debtors were entitled to summary judgment in any event because TXT had failed to identify sufficient evidence to support a viable negligence claim against GTAT.  Id. at 799-803.

## II.  STANDARD OF REVIEW

This court has jurisdiction pursuant to 28 U.S.C. § 158(a)(1) to hear appeals from the bankruptcy court's final judgments, orders, and decrees.  In resolving this appeal, I "scrutinize that court's findings of fact for clear error, and afford de novo review to its conclusions of law."  Brandt v. Repco Printers & Lithographics, Inc. (In re Healthco Int'l), 132 F.3d 104, 107 (1st Cir. 1997).  Where the court below made discretionary rulings, I review for abuse of discretion.  See Hoover v. Harrington (In re Hoover), 828 F.3d 5, 8 (1st Cir. 2016).  I may "affirm the bankruptcy court order on any ground apparent from the record on appeal."  Cromwell v. Countrywide Home Loans, Inc., 483 B.R. 36, 40 (D. Mass. 2012) (quoting Spenlinhauer v. O'Donnell, 261 F.3d 113, 117 (1st Cir. 2001)).

The bankruptcy court denied TXT's administrative expense claim on summary judgment.  TXT's disputed claim constituted a "contested matter" under Bankruptcy Rule 9014, to which the

6

summary judgment standard of Rule 56 applies.  See Fed. R. Bankr. P. 7056, 9014(c); see also Gray v. Manklow (In re Optical Techs., Inc.), 246 F.3d 1332, 1334 (11th Cir. 2001).  Under Rule 56, summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The bankruptcy court is required to construe the evidence "in the light most agreeable to the nonmoving party and draw all reasonable inferences in that party's favor," but it must "afford no evidentiary weight to 'conclusory allegations, empty rhetoric, unsupported speculation, or evidence which, in the aggregate, is less than significantly probative.'"  Tropigas de Puerto Rico, Inc. v. Certain Underwriters at Lloyd's of London, 637 F.3d 53, 56 (1st Cir. 2011) (quoting Rogan v. City of Boston, 267 F.3d 24, 27 (1st Cir. 2001)).  I review the bankruptcy court's summary judgment ruling de novo.  See Daniels v. Agin, 736 F.3d 70, 78 (1st Cir. 2013).

### III. ANALYSIS

TXT has abandoned its initial effort to base its administrative expense claim on a postpetition failure by GTAT to abide by its prepetition obligations.  See Doc. No. 28 at 2-4.  Instead, it attempts to salvage only its negligence claim by pointing to three alleged errors in the reasoning process that

led the court to reject the claim. First, TXT challenges the court's determination that the negligence claim was untimely by arguing that its timely original claim can be fairly read to include a negligence claim. Next, it argues that the court's timeliness ruling was incorrect even if TXT asserted the claim for the first time in its objection to the Debtors' summary judgment motion. Finally, it challenges the court's determination that TXT failed to produce sufficient evidence in response to the Debtors' summary judgment motion to support a viable negligence claim. I address each argument in turn.

**A.   Does TXT's Initial Motion State a Claim for Negligence?**

TXT argues that its original administrative expense claim can be fairly read to include a negligence claim because the claim "specifically referenced 'negligence'" and "pled the essence" of a claim based on Reading v. Brown, 391 U.S. 471, 483 (1968), the Supreme Court decision that recognizes a creditor's right to claim administrative priority for a postpetition negligence claim in certain circumstances. Doc. No. 22 at 6. I am unpersuaded by TXT's arguments.

When TXT initially identified the facts supporting its claim, it did not assert that GTAT acted negligently or mention any terms generally associated with negligence. Instead, tracking the settlement agreement, it stated that it "was harmed, and continues to be harmed, by [GTAT's] refusal to remove the 10

8

[furnaces]" and "has been damaged due to [GTAT's] continuing failure to provide current and compatible software licenses . . . and provide the service necessary to render the software operational."  See Doc. No. 24-2 at 9-10.  Notwithstanding TXT's contrary assertion, this language does not state a claim that GTAT acted negligently.  By largely reflecting GTAT's obligations under the settlement agreement, TXT instead suggested only that GTAT committed postpetition violations of its prepetition obligations.

Although TXT discussed Reading in its initial claim and mentioned "negligence" in describing the facts of that case, the discussion merely provided context for what TXT argued was a "line of cases stem[ming]" from Reading.  TXT began the relevant portion of its motion by stating that where a "post-petition transaction" causes "post-petition harm to [a] claimant," the claimant may be entitled to an administrative expense.  Doc. No. 24-2 at 8.  TXT then introduced Reading as the origin of the "line of cases" establishing this broader rule.  See id.  It next cited First Circuit cases interpreting Reading, and, immediately before applying the law to the facts of its case, claimed that the First Circuit has construed Reading to mean "that where a debtor continues to breach an order post-petition," an administrative expense may be appropriate.  Id. at 9 (footnote omitted).  By asserting this rule immediately before identifying

9

the alleged harms to TXT, emphasizing in a footnote that the arbitral award constitutes an order, and then framing the harms to TXT in terms of GTAT's prepetition obligations, TXT merely raised a claim grounded in GTAT's postpetition violations of its prepetition obligations rather than a postpetition negligence claim.  See id. at 9–10 & n.5.

TXT also failed to notify the Debtors of its intent to plead a negligence claim at any point prior to the filing of its objection to the Debtor's summary judgment motion.  At a June 2015 hearing before the bankruptcy court, TXT invoked the need for "factual findings" on the functionality of the furnaces and software licenses, but made no reference to negligence.  Id. at 73–74.  Further, in an October 2015 court-approved stipulation addressing GTAT's failure to remove 10 nonconforming furnaces, TXT reserved its other claims but again made no mention of negligence.  Id. at 160.  And even though the debtors noted in their preliminary objection to TXT's claim that "TXT does not . . . allege that it suffered any damages on account of a postpetition tort," TXT did not rebut that assertion.  Id. at 28 n.14.  Perhaps most tellingly, when invited on appeal to identify any correspondence or documents besides its initial motion that would have specifically notified GTAT of TXT's postpetition negligence claim before the Debtors filed their summary judgment motion, TXT did not point to any documents that would support its

position.  Doc. No. 28 at 5-7.  Accordingly, the bankruptcy court correctly determined that TXT failed to adequately raise a claim of postpetition negligence until it filed its objection to the Debtors' motion for summary judgment.

B. **May TXT Assert Its Negligence Claim for the First Time in Its Objection to a Summary Judgment Motion?**

TXT next argues that the bankruptcy court improperly refused to consider its negligence claim even if TXT presented the claim for the first time in its objection to the Debtors' motion for summary judgment.

The bankruptcy court based its determination that TXT's negligence claim came too late on the well-established rule that "[p]laintiffs may not 'raise new and unadvertised theories of liability for the first time in opposition to a motion for summary judgment.'" Miranda-Rivera v. Toledo Dávila, 813 F.3d 64, 76 (1st Cir. 2016) (quoting Calvi v. Knox County., 470 F.3d 422, 431 (1st Cir. 2006)).  TXT argues, however, that the case law the court relied on does not apply when an administrative expense claim is challenged in a motion for summary judgment.  In developing this argument, TXT notes that a disputed administrative claim is treated as a contested matter, rather than an adversary proceeding, under the Bankruptcy Rules.  See Doc. No. 22 at 14-15.  Because contested matters are not subject to the amendment standards that apply in adversary proceedings,

11

TXT argues, the case law the bankruptcy court relied on does not limit its ability to assert a new basis for its claim for the first time in an objection to a motion for summary judgment.  See id. at 15-16.  Again, I disagree.

The rule that prevents litigants from raising new theories of liability for the first time in response to a summary judgment motion is grounded in Rule 56.  See Miranda-Rivera, 813 F.3d at 76; Calvi, 470 F.3d at 430-31.  And Rule 56 applies in contested matters.  See Fed. R. Bankr. P. 7056, 9014(c).  In the absence of this rule, plaintiffs would have less incentive to plead with care, and defendants would likely be required to devote more of their efforts to investigating theories not pleaded.  Such an outcome would not only be generally wasteful, but it would also prejudice defendants who conduct discovery and prepare for summary judgment without notice of a theory pleaded later.

The facts of this case reinforce the bankruptcy court's ruling and underscore the importance of the rule.  Recognizing that the facts underlying TXT's claim were in dispute, the bankruptcy court allowed for a period of discovery that ended on November 6, 2015.  See Doc. No. 24-2 at 151.  The court also set December 15, 2015, as the deadline for dispositive motions.  Id. at 164.  In reliance on this schedule, the parties conducted discovery, the Debtors filed a motion for summary judgment at the deadline, and TXT responded with an objection asserting a claim

12

that it had not included in its initial motion.  See id. at 230; Doc. No. 24-4 at 366-67.  Raising a new claim after the discovery and dispositive motion deadlines had passed prejudiced the Debtors.  They expended time and resources conducting discovery and preparing for summary judgment without adequate notice of TXT's new claim.[2]  Given this prejudice, TXT's arguments that the Debtors could have engaged in additional discovery or asked for time to respond are unavailing.  See Doc. No. 22 at 20.

The record is also devoid of evidence suggesting that unusual circumstances prevented TXT from including a negligence claim in its initial motion.  TXT asserts that evidence supporting a negligence claim — evidence that GTAT acted gratuitously postpetition, instead of pursuant to contract — first came to light during discovery.  See id. at 9, 19.  However, TXT did not need to wait for such evidence to arise to

---

[2] This misallocation of time and resources is particularly prejudicial here because delay in resolving TXT's administrative claim could have jeopardized the Debtors' reorganization.  See Doc. No. 24-9 at 745 (February 4, 2016 hearing) (bankruptcy court noting, in context of another administrative expense claim, that "[i]f the confirmation is delayed, there will be no company").  The entities who committed exit financing to the Debtors conditioned the financing on, inter alia, (1) the Debtors' reorganization plan going into effect by March 7, 2016, (eventually March 14 in the court-approved plan) and (2) the Debtors' having at least $27.5 million in cash when the plan became effective, not including any amounts paid or reserved for administrative expenses.  See Doc. No. 24-2 at 174, 205-7; Doc. No. 24-9 at 962.

present its negligence claim. GTAT's engineers installed license codes at TXT's request in November 2014. Shortly thereafter TXT knew that its furnaces had been damaged. Thus, TXT should have been aware of a possible negligence claim well before the discovery and dispositive motion deadlines passed in late 2015. Under these circumstances, the bankruptcy court correctly determined that TXT waited too long to raise its postpetition negligence claim.[3]

## C. Does the Record Contain Sufficient Evidence to Support a Negligence Claim?

TXT's negligence claim has evolved during the course of this litigation. In bankruptcy court, TXT based its claim primarily on its contention that its damages were caused by GTAT's breaches of its prepetition duties "to provide the software licenses" and "to provide whatever service was necessary to render the software operational." See Doc. No. 24-2 at 377-79 (quoting settlement agreement for latter duty). It then argued that GTAT breached these duties by "failing to provide the necessary software to operate the [furnaces], by failing to exercise reasonable care in

---

[3] To the extent that TXT contends that its negligence claim should have been treated as a de facto amendment to its original claim, the Debtors argue that the amendment came too late because it was asserted after the bar date for administrative claims. See Doc. No. 24 at 26-28. I need not address this argument, which neither party has adequately analyzed, because TXT waited too long to assert its new claim regardless of whether the claim was subject to the bar date.

14

installing the software, failing to provide the necessary standard operating procedures and checklist to reoperate the [furnaces], and by failing to inform TXT of the harm in attempting to operate furnaces that had been idled for two years." Id. at 378. On appeal, TXT argues only that its damages stem from a voluntarily assumed duty by GTAT to warn TXT that it needed to refurbish the furnaces before it attempted to operate them. See Doc. No. 28 at 9-16.

As narrowed, TXT's negligence claim suffers from two fundamental flaws. First, there is insufficient evidence in the record to support TXT's claim that GTAT ever voluntarily assumed a postpetition duty to warn TXT that it needed to refurbish the furnaces before attempting to operate them. At most, the evidence suggests that GTAT may have voluntarily assumed the duty to properly install license codes on the furnaces, but TXT does not currently argue that its damages were caused by a breach of that duty. See Doc. No. 28 at 13-15.

In a last ditch effort to save its claim, TXT points primarily to a single deposition excerpt in which GTAT's general counsel was questioned about an email chain between TXT and GTAT in which TXT expressed concern about the operability of the furnaces. The excerpt includes the following exchange:

> Q. Okay. And does that series of emails reflect the fact that GT was continuing to work with TXT as of [August 2015] to try to render the 20 [furnaces]

15

```
            functional?

            A.   Well we were -- we were doing what we could
       reasonably do within the context of the settlement
       agreement and other circumstances of our relationship.
```

Doc. No. 24-5 at 488.  TXT argues that this exchange supports its claim that GTAT voluntarily assumed a duty to assist TXT in getting the furnaces to work, which necessarily included a duty to warn TXT that the furnaces needed to be refurbished.  I disagree.  Even when the excerpt is construed in the light most favorable to TXT, it merely describes GTAT's decision to assist TXT with the installation of the license codes.  It does not amount to an admission that it had assumed a broader duty to warn TXT that the furnaces needed to be refurbished.[4]

Even assuming the record supports TXT's claim that GTAT had a duty to warn TXT about the danger of operating idled furnaces without refurbishment, it still does not contain sufficient evidence to support a claim that GTAT's failure to warn caused

---

[4] TXT's negligence claim also fails for a related reason.  Under New York law, which the parties agree is the governing law in this case, a voluntary assumption of duty cannot support a negligence claim unless "defendant's conduct placed plaintiff in a more vulnerable position than plaintiff would have been in had defendant done nothing."  Heard v. New York, 623 N.E.2d 541, 544 (1993); see also Ward v. Edinburg Marina, 741 N.Y.S.2d 304, 306 (App. Div. 2002).  Here, the record does not support a claim that TXT's decision to restart the furnaces without first refurbishing them was in any way based on GTAT's actions in this case.  Therefore, even if GTAT had an unexpressed intention to do more than merely assist TXT with the installation of license codes, that unexpressed intention could not make it liable to TXT on a failure-to-warn theory.

TXT's injuries. The record shows, without triable dispute, that TXT knew that any attempt to operate the furnaces without refurbishment after a long period of disuse could cause damage. TXT's general counsel submitted a declaration to the bankruptcy court stating that, at an internal meeting on October 1, 2014, TXT "discussed . . . whether [GTAT] would be required to provide a standard operating procedure or an inspection checklist to ensure that TXT's [furnaces] would be able to reoperate without damage because the [furnaces] had been inoperable for two years." Doc. No. 24-4 at 386. In a deposition, TXT director Peggy Hsu described the same meeting and noted that the idled furnaces had to "follow a standard operating procedure in order to prevent" damage. Doc. No. 24-6 at 544-45. Because TXT was aware of the risk of operating the furnaces without refurbishment, it cannot hold GTAT liable for failure to warn it of a danger that it already understood. See Spano v. Bertocci, 749 N.Y.S.2d 275, 278 (App. Div. 2002) (where plaintiff already knew about risks of medication, no rational basis to find that doctor's failure to warn was proximate cause of injury); Ohlhausen v. City of New York, 898 N.Y.S.2d 120, 123-25 (App. Div. 2010) (where driver did not rely on bus driver's hand gesture to enter intersection, bus driver did not proximately cause driver's subsequent collision with plaintiff); cf. Heard, 623 N.E.2d at 546.

## IV. CONCLUSION

For the reasons provided above, the bankruptcy court's (1) Memorandum of Decision, (2) Order denying TXT's administrative expense claim, and (3) Order granting Debtors' motion for summary judgment are affirmed.

SO ORDERED.

/s/Paul Barbadoro
Paul Barbadoro
United States District Judge

February 13, 2017

cc: William S. Gannon, Esq.
    Daniel W. Sklar, Esq.
    G. Alexander Bongartz, Esq.
    James T. Grogan, Esq.
    Luc A. Despins, Esq.
    Geraldine L. Karonis, Esq.